[No. 32973.   *En Banc.*   February 18, 1955.]

E. L. WALKER *et al., Appellants,* v. JOHN P. RYND *et al., Respondents.*[1]

*Marion Garland, Jr., William R. Garland,* and *John A. Bishop,* for appellants.

*Eggerman, Rosling & Williams (Henry E. Kastner,* of counsel), and *Gerard N. Fisher,* for respondents.

HAMLEY, C. J.—This action was brought to recover damages for injuries sustained when Mrs. Carolyn Walker fell from a chair in the office of Dr. John P. Rynd. The case was tried to a jury. At the close of plaintiffs' case, the court sustained a challenge to the sufficiency of the evidence and dismissed the action. Plaintiffs appeal.

The only question presented here is whether the trial court erred in taking the case from the jury. The court did so on the ground that there was no substantial evidence in favor of appellants on the issues of negligence or proximate cause; and possibly on the further ground that there was contributory negligence as a matter of law.

The testimony produced by appellants at the trial, which, for our present purposes, must be considered as true, showed the following facts: The accident occurred on March 3, 1953.

[1]Reported in 280 P. (2d) 259.

Two days before, Dr. Rynd, a physician in Bremerton, Washington, had taken over the office where the accident occurred, which had formerly been occupied by another physician. There was an examination room in connection with this office. In the examination room, there were, among other pieces of furniture, a chair and a stool.

The chair was placed in the room with its back approximately three inches from a wall. The chair measures fourteen and a half inches across the seating surface, and eleven and a half inches between the bearing surfaces on the legs. The sides of the circular seat extend two and a quarter inches beyond the point where the legs join the seat, and one and a half inches beyond the point where the legs rest on the floor. The seat is eighteen and a half inches from the floor. The chair is not heavy and does not have arms. However, it is a strong, sturdy chair, with a nearly straight back.

The chair was standing on an asphalt tile surface which was cleaned and waxed regularly. The accident happened five days after the floor was last cleaned and waxed, during which period the floor had ordinary and usual use as a doctor's examination room.

The stool was on casters, and operated up and down like a typical piano stool. At the time of the accident, it was adjusted to be seventeen inches from the floor.

Mrs. Carolyn Walker had not been a patient of Dr. Rynd prior to the fall, except that on one occasion he may have refilled a prescription for her. For some months, she had been a patient in the office which Dr. Rynd had just acquired. As such, she was known to Dr. Rynd's nurse, Mrs. Thelma Britton, who had been working in the same office for several years.

At the time of the accident, Mrs. Walker was sixty-four years of age. She was suffering from varicose veins and the residual effects of a stroke and accompanying paralysis of the right leg, suffered in 1948. She also had arthritis of the spine and more or less in all of her joints. She had a varicose ulcer on her right leg, the treatment of which was the cause of her going to Dr. Rynd's office on the day in question.

These physical conditions had the effect of making Mrs. Walker unsure of herself and uncertain in her actions. Her sense of balance was "off" and she was a little "wobbly." While the stroke had left her somewhat mentally uncertain, she could carry on a normal conversation. She walked deliberately, watched her step, but liked to have someone with her when she was crossing streets or was downtown. Mrs. Walker was able to go to church regularly, maintain a garden of fair size, do housekeeping and cooking, and leave her home.

The nurse, Mrs. Britton, was familiar in a general way with Mrs. Walker's disabilities. While the nurse did not know that Mrs. Walker had suffered a stroke, she was aware of the fact that the patient was unsteady on her feet.

When Mrs. Walker went to the doctor's office for treatment of her varicose ulcer, the nurse took her arm and assisted her to the examination room. The nurse asked Mrs. Walker to be seated in the chair which has been described, and assisted the patient in sitting on the chair. Mrs. Walker sat squarely on the chair, with both feet on the floor. She was sixteen and a half inches across the lower back, as compared to the fourteen-and-a-half-inch seating surface of the chair.

The nurse then placed Mrs. Walker's right foot on the castered stool. This placed the right leg and foot at about the same height as the chair. The nurse then rolled down Mrs. Walker's hose and unrolled the bandage. When the sore was exposed, Mrs. Walker leaned forward. The chair went out to one side, and Mrs. Walker landed on the floor in a sitting position. She sustained a broken leg and other injuries.

Regarding the exact cause of the fall, Mrs. Walker testified as follows:

"Well, she went to pull off my right stocking and as she pulled off the stocking, the chair—I didn't fall off the chair, the chair went out right down like that (indicating) and I was so badly hurt that it is hard for me to say just how it all happened. It [was] when she took off the stocking that the chair slipped out from under me  .  .  ."

The nurse, Mrs. Britton, testified:

"Q. (By Mr. Garland) The leg was placed then on top of the stool? A. That is right. At this level down as far as the stool will go at my feet. Q. All right. Then what happened? A. I rolled down her hose which was on top with the elastic bandage. I started at the knee with my left hand under the arm I lifted—MR. KASTNER: You said 'arm.' A. Under her leg, rolling the bandage on the right hand and catching it with my left. Q. And then what happened? A. She was talking to me at the time which we usually did throughout these things and just as I got to within the area of the ulcer she hastily leaned forward with a motion telling me to look for the bugs that were in the ulcer and that in my opinion is when she threw herself from the chair. Q. Did she point with her hand when she came forward? A. Yes. Q. Which hand? A. Left hand. Q. That would be this hand (indicating)? A. That's right. Q. And she came forward when you got to the place where the ulcer was? A. That is right. Q. And what then happened to the chair? You can show me if you want what happened to the chair. A. The chair went in this direction (indicating) and Mrs. Walker set here (indicating). Q. Mrs. Walker hit the floor is that right? A. Yes. Q. Take the stand again, please. You kept the foot in your hand at all times, is that right? A. Resting on my hand. Her foot was actually on the stool. It was her ankle that was in my hand resting on it. Q. How did Mrs. Walker land? What was her physical position in the room when she landed? A. She was in a sitting position. Q. And she came in contact with the floor directly under where the chair had been? A. Well, I couldn't say. Q. Well, think back now. Do you remember where the chair was and where she was? A. Yes. Q. All right. Where were they in relation one to the other? A. After she had fallen? Q. After she had fallen where was she in relation to where the chair was immediately before she fell? A. Well, close to the same area. Q. Very close to the same area? In other words, she had practically fallen straight down? A. I would assume so."

Appellant called Keith Twitchell, a safety engineer, as one of her witnesses. Omitting his expressions of opinion as to the safety of the chair (which were favorable to appellants), Twitchell testified, in part, as follows:

"A. From the standpoint of my knowledge of chairs which have been important to me as a safety engineer, the type of seating equipment used, this chair has the narrowest spacing

between the legs of any chair of a backtype chair or armchair which I have ever encountered. . .

"With increasing distances between the legs of the chairs, the safety of the chair increases insofar as the tipping characteristics are concerned. In fact it can be shown through some fairly simple computations that the safety and tipability of the chair varies directly and is directly proportional to the width between the legs. Now, when I am referring to that I am talking about side tipping. . .

"The size of the seating area . . . is abnormally small when compared with chairs of any type that you might want to choose for comparison either in this courtroom or anywhere else. That puts quite a burden upon a person sitting down in it and makes it a critical matter to properly place your weight on such a small area.

"Added to that is a third matter, the overhang of the seating area. When I say 'overhang,' I mean over or vertically— Q. Would you come here and show me? A. Vertically beyond the line of bearing of this particular chair on the deck, which is approximately through here (indicating) as I recall from looking at the bearing point on the chair, and it is quite shiny on the inside. This seating area extends, as I remember, it was around fifteen inches wide approximately, from edge to edge, from the outside edge. I think that was established in the previous part of the courtroom proceedings and we established also that the bearing point between this leg and that leg on the floor was around eleven and a half or three quarters inches, somewhere in there.

"So that leaves approximately three inches to distribute one and a half inches on this side and one and a half inches on that side, overhanging the bearing point. Now, when you have a situation like that that permits the weight to be still sitting on the chair but to be concentrated on the chair in such a position that due to a shifting of the leg or due to sitting on the chair unevenly in such a position as to overbalance the chair without—with a very small amount of sideways force being exerted.

"In fact, the chair, assuming that the person might lean out a little ways and thereby get the center of gravity of their body beyond that one and a half inch point and still be on the chair, the chair could and probably would in my opinion, tip over without any further aid or without anybody pushing it or twisting the person and that has nothing to do with whether their leg has been lifted or anything else.

".  .  .  The last thing I ought to mention is the fact that there is a metal contact quite shiny from wear with the floor and it is a substantial fact that the friction existing between a metal, a shiny metal surface and an asphalt tile floor or any kind of floor as far as that goes, is going to be less with a metal surface than it would be with a wooden surface or rubber surface or some other surface where the coefficient of friction would be greater which would be practically in any type of material used in the manufacture of chairs, normally wood or metal.  .  .

"Q. (By Mr. Garland) Mr. Twitchell, the fact that some woman sitting down on the chair went an inch over on either side, would that have any effect on the probability of the chair being tipped?  A. Well, to get back to a fact that we do have an area upon which we may sit on this chair which is actually over the side of the bearing of the legs, and that means that a person would only have to move their weight a very small distance on that particular seat and transfer the weight on to one hip or the other, to actually have the weight concentrated on a center of gravity, a body might quite easily be concentrated over the outside of that chair and possibly off the chair itself.  When I say over the 'outside,' I mean the inch and a half overhang I spoke of. It would become relatively more of a problem the larger the person is to maintain equilibrium on a chair of that small seating area without sidearms."

■ In our view, the evidence summarized above presented a jury question on negligence, proximate cause, and contributory negligence.

Appellant's evidence, if believed, would support a finding that Mrs. Walker would not have fallen from the chair had not the nurse, for whose negligence Dr. Rynd is accountable, supplied her with a chair which was unsafe for use under the conditions and circumstances then existing, which include Mrs. Walker's size, age, physical and mental condition, the particular construction of the chair, the condition of the floor, and the use being made of the chair and the castered stool.

If the jury had found that the nurse was negligent in seating Mrs. Walker in this chair, under the conditions and circumstances then existing, the fact that Mrs. Walker fell

therefrom in the manner shown would clearly warrant a finding favorable to her on the issue of proximate cause.

Likewise, if it were found that the proximate cause of Mrs. Walker's fall was the negligent act of supplying her with a chair which was unsafe for the particular use intended, it could hardly be held, as a matter of law, on the evidence presented in this case, that it was contributory negligence for her to fall. Mrs. Walker did not choose this chair to sit in. The nurse selected the chair and requested Mrs. Walker to sit in it, and assisted her to do so. Mrs. Walker had not, to her recollection, sat in this chair before. Appellants' evidence also tended to show that Mrs. Walker's sudden movement when the bandages were removed was not unusual and, under the circumstances, was to be anticipated.

The decisions cited by both parties have been examined, but we have not found them particularly helpful in dealing with the facts of this particular case. The principles of law which are involved are well understood and not here in dispute. It should be said, however, that we have considered this case as one involving ordinary principles of negligence law and as not concerned with that special branch of negligence known as malpractice.

In our review of the evidence, we have disregarded general expressions of opinion as to the cause of the fall or the safety of this particular chair, as we consider these as questions which do not call for expert testimony. Evidence regarding the physical characteristics of the chair and the effect thereof upon its stability is proper and has been considered. These observations should be borne in mind at the new trial.

The trial court did not err in denying appellants' motion to amend their complaint to show that Dr. Rynd was negligent in holding out Mrs. Britton as a professional nurse, when, in fact, she was not licensed as such. This circumstance, in our opinion, could not have been a proximate cause of the accident. If Mrs. Britton was not negligent, the additional allegation would avail nothing; if she was negligent, the additional allegation would be unnecessary.

The judgment is reversed and the cause remanded, with direction to grant appellants a new trial. Appellants will recover their costs on this appeal, without regard to the ultimate result of the action.

ALL CONCUR.